229 P.3d 242

STATE of Arizona, acting by and through Mark WINKLEMAN, State Land Commissioner, and the Arizona State Land Department; and Defenders of Wildlife, Donald Steuter, Jerry Van Gasse, Jim Vaaler, Plaintiffs/Appellants,

v.

ARIZONA NAVIGABLE STREAM ADJU-DICATION COMMISSION; Salt River Project Agricultural Improvement and Power District; Salt River Valley Water Users' Association; Arizona State University; City of Tempe; City of Phoenix; City of Mesa; Freeport–McMoran Corporation; Maricopa County; Cemex Cement, Inc.; Gila River Indian Community; Home Builders Association of Central Arizona; Maricopa County Flood Control District, Defendants/Appellees.

No. 1 CA–CV 07–0704.

Court of Appeals of Arizona, Division 1, Department C.

April 27, 2010.

Terry Goddard, Attorney General By Joy L. Hernbrode, Assistant Attorney General, Laurie A. Hachtel, Assistant Attorney General, Phoenix, Attorneys for Plaintiff/Appellant State of Arizona.

Arizona Center for Law in the Public Interest By Joy E. Herr–Cardillo, Timothy M. Hogan, Tucson, Attorneys for Plaintiffs/Appellants Defenders of Wildlife, Donald Steuter, Jerry Van Gasse, and Jim Vaaler.

Jennings, Haug & Cunningham, L.L.P. By Curtis A. Jennings, Phoenix, Attorneys for Defendant/Appellee Arizona Navigable Stream Adjudication Commission.

Salmon, Lewis & Weldon, P.L.C. By John B. Weldon, Jr., Mark A. McGinnis, Rebecca C. Goldberg, Phoenix, Attorneys for Defendants/Appellees Salt River Project Agricultural Improvement and Power District and Salt River Valley Water Users' Association.

Moyes Sellers & Sims, Ltd. By Steve L. Wene, Phoenix, Attorneys for Defendant/Appellee Arizona Board of Regents acting on behalf of Arizona State University.

Tempe City Attorney's Office By Charlotte Benson, Tempe, Attorneys for Defendant/Appellee City of Tempe.

Engelman Berger, P.C. By William H. Anger, Phoenix, Attorneys for Defendant/Appellee City of Mesa.

Ryley, Carlock & Applewhite, P.A. By Cynthia M. Chandley, L. William Staudenmaier, III, Michael T. Kafka, Phoenix, Attorneys for Defendant/Appellee Freport–McMoRan Corporation.

Lewis and Roca, L.L.P. By Carla Consoli, Phoenix, Attorneys for Defendant/Appellee Cemex Cement, Inc.

Jennifer K. Giff, General Counsel, Gila River Indian Community By John T. Hestand, Timothy L. Pierson, Ruth E. Koester, Ann Marie Chischilly, Sacaton, Attorneys for Defendant/Appellee Gila River Indian Community.

Mariscal, Weeks, McIntyre & Friedlander, P.A. By Gary L. Birnbaum, James T. Braselton, Barry R. Sanders, Phoenix, Attorneys

for Amicus Curiae Land Title Association of Arizona.

## OPINION

WINTHROP, Presiding Judge.

¶ 1 This appeal involves the long-standing battle to determine who owns the beds of rivers ("bedlands") within the State of Arizona. At specific issue are the bedlands of the Lower Salt River (a/k/a "the River"), which runs from Granite Reef Dam above Phoenix through the highly populated Salt River Valley to the confluence with the Gila River. The crucial question to be resolved is whether the River was navigable in its ordinary and natural condition.[1] If it was navigable, title to the bedlands passed to the State from the federal government at statehood on February 14, 1912, and the State retains title to those bedlands. If the River was not navigable, the neighboring riparian owners hold title. The Arizona Navigable Stream Adjudication Commission ("ANSAC" or "the Commission"), which is charged by statute with making the navigability determination, see A.R.S. §§ 37–1121 (Supp.2009), – 1123(A) (2003), –1128(A) (Supp.2009), determined that the River was not navigable. Plaintiffs—the State of Arizona, Defenders of Wildlife, and others (collectively "Appellants")—appeal from the superior court's judgment affirming ANSAC's determination. Because we agree with Appellants that ANSAC misapplied a pertinent test for determining navigability, and the superior court erred in affirming ANSAC's administrative

decision, we vacate and remand for further proceedings consistent with this decision.

## FACTS AND PROCEDURAL HISTORY

¶ 2 On February 14, 1912—the instant it achieved the constitutional status of a state—Arizona acquired title to all lands below the high-water mark[2] in all navigable watercourses within its boundaries pursuant to the equal footing doctrine.[3] *Ariz. Ctr. for Law in the Pub. Interest v. Hassell,* 172 Ariz. 356, 359–60, 837 P.2d 158, 161–62 (App.1991). However, determination of Arizona's title to the bedlands has lagged almost a century behind the State's admission to the Union because, until 1985, the only watercourse in which the State asserted an equal footing claim was the Colorado River. *Id.* at 360, 837 P.2d at 162 (citing *Land Dep't v. O'Toole,* 154 Ariz. 43, 46, 739 P.2d 1360, 1363 (App. 1987)). In 1985, the State claimed title to the beds of all Arizona watercourses that were navigable when Arizona became a state. *Id.* at 359–60, 837 P.2d at 161–62.

¶ 3 In 1987, the Arizona Legislature responded to the State's assertion of title by passing House Bill ("H.B.") 2017, "which attempted to relinquish most of the state's interest in Arizona's watercourse bedlands." *Defenders of Wildlife,* 199 Ariz. at 416, ¶ 3, 18 P.3d at 727. The legislation quitclaimed, without compensation, the bedlands of all rivers in the State except those of the Colorado, Gila, Salt, and Verde rivers. *Hassell,* 172 Ariz. at 360, 837 P.2d at 162. The legislation also allowed record titleholders of lands in or near the beds of the Gila, Salt, or

1. Arizona Revised Statutes ("A.R.S.") section 37–1101(5) (2003) defines navigability as follows:
 "Navigable" or "navigable watercourse" means a watercourse that was in existence on February 14, 1912, and at that time was used or was susceptible to being used, in its ordinary and natural condition, as a highway for commerce, over which trade and travel were or could have been conducted in the customary modes of trade and travel on water.

2. Arizona Revised Statutes § 37–1101(6) defines the high-water mark as follows:
 "Ordinary high watermark" means the line on the banks of a watercourse established by fluctuations of water and indicated by physical characteristics, such as a clear natural line impressed on the bank, shelving, changes in the character of the soil, destruction of terres-

trial vegetation or the presence of litter and debris, or by other appropriate means that consider the characteristics of the surrounding areas. Ordinary high watermark does not mean the line reached by unusual floods.

3. "Under the equal footing doctrine, on the day in which individual states enter the Union, title to the lands under territorial navigable watercourses is transferred from the federal government to the newly-established state government." *Defenders of Wildlife v. Hull,* 199 Ariz. 411, 415, ¶ 2, 18 P.3d 722, 726 (App.2001) (citations omitted). The doctrine applies to vest title in the State to the bedlands of only those watercourses that meet the navigability test at statehood. *Id.* at 418, ¶ 13, 18 P.3d at 729.

Verde Rivers to obtain a quitclaim deed from the State for twenty-five dollars per acre. *Id.* The money received from these quitclaims was to be aggregated in a fund to be used to acquire land in riparian areas for public benefit. *Id.* The legislation further provided that "the public has the right to recreational use of surface waters between the current ordinary high water marks of a watercourse that was navigable as of February 14, 1912 without regard to the ownership of the bed." *Id.* (quoting former A.R.S. § 37–1104(A) (Supp.1990) ).

 ¶ 4 The legislation was challenged in a lawsuit and, after the superior court entered summary judgment in favor of the defendants, this court reversed that judgment and remanded. *Id.* at 372, 837 P.2d at 174. We determined that, under the equal footing doctrine, the State holds title to the land located under its navigable waterways in trust for its citizens. *Id.* at 359–60, 364–65, 837 P.2d at 161–62, 166–67. Because H.B. 2017 failed in part to provide a mechanism for particularized assessment of the validity and value of the equal footing claims it relinquished, and we found substantial evidence in the record that might support a finding of navigability of rivers and streams other than the Colorado River, we held that the legislation violated the public trust doctrine[4] and the Arizona Constitution's gift clause.[5] *See*

*Hassell,* 172 Ariz. at 363, 369–72, 837 P.2d at 165, 171–74; *see also Defenders of Wildlife,* 199 Ariz. at 416, ¶ 3, 18 P.3d at 727.

¶ 5 As a result of *Hassell,* the Arizona Legislature passed legislation in 1992 to again address the State's claims to the bedlands. *See Defenders of Wildlife,* 199 Ariz. at 416, ¶ 5, 18 P.3d at 727 (citing former A.R.S. §§ 37–1121 to –1131 (1993) (added by 1992 Ariz. Sess. Laws, ch. 297, § 3 (2nd Reg.Sess.) (eff. July 7, 1992) ) ). The 1992 legislation established ANSAC and charged it with the responsibility for determining which watercourses were navigable at statehood by hearing evidence presented by the Arizona State Land Department ("ASLD") and the public. *See id.* ANSAC was to then issue a final administrative determination of navigability subject to judicial review. *See id.* The statutory criteria for determining navigability[6] paraphrased the federal test set forth in *The Daniel Ball,* 77 U.S. 557, 563, 19 L.Ed. 999 (1870), *superseded in part by statute as recognized in Rapanos v. United States,* 547 U.S. 715, 723–34, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006):

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade

---

4. The public trust doctrine restricts the State's ability to dispose of land held in public trust. *See Hassell,* 172 Ariz. at 364–65, 837 P.2d at 166–67. The fundamental reason for this restriction is that the State has a fiduciary duty to its citizens to protect their sovereign resources from the actions of private interests that interfere with public trust purposes. *See Defenders of Wildlife,* 199 Ariz. at 418, ¶ 12, 18 P.3d at 729. "[A] state, as administrator of the trust in navigable waters on behalf of the public, does not have the power to abdicate its role as trustee in favor of private parties." *Hassell,* 172 Ariz. at 366, 837 P.2d at 168 (quoting *Kootenai Envtl. Alliance, Inc. v. Panhandle Yacht Club, Inc.,* 105 Idaho 622, 671 P.2d 1085, 1088 (1983) (citing *Ill. Cent. R.R. Co. v. Illinois,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892))).

5. Article 9, Section 7, of the Arizona Constitution, also known as the gift clause, provides in pertinent part as follows: "Neither the state, nor any county, city, town, municipality, or other subdivision of the state shall ever ... make any donation or grant, by subsidy or otherwise, to

any individual, association, or corporation...." The gift clause was adopted "to prevent governmental bodies from depleting the public treasury by giving advantages to special interests ... or by engaging in non-public enterprises." *Wistuber v. Paradise Valley Unified Sch. Dist.,* 141 Ariz. 346, 349, 687 P.2d 354, 357 (1984) (citations omitted).

6. Former A.R.S. § 37–1101(6) (1993) defined navigability as follows:

> "Navigable" or "navigable watercourse" means a watercourse, or a portion or reach of a watercourse, that was in existence on February 14, 1912, and at that time was used or was susceptible to being used, in its ordinary and natural condition, as a highway for commerce, over which trade and travel were or could have been conducted in the customary modes of trade and travel on water.

In 2001, the statute was renumbered as subsection (5), and the phrase "or a portion or reach of a watercourse" was deleted. *See* 2001 Ariz. Sess. Laws, ch. 166, § 3 (1st Reg.Sess.).

and travel are or may be conducted in the customary modes of trade and travel on water.

¶ 6 After collecting information regarding the navigability of Arizona's rivers and streams, ANSAC on November 10, 1993, initially classified the Lower Salt River as having the characteristics of navigability at the time of statehood. *See* A.R.S. §§ 37–1125(A) (1993) (requiring ANSAC to initially classify a watercourse either as having characteristics of possible navigability as of February 14, 1912, or as having no such characteristics), –1126 (1993) (providing for public hearings after initial classification).

¶ 7 Soon after ANSACs initial classification of the River, the legislature made significant changes to the Commission's authority by amending the statutes governing its parameters and procedures, making ANSAC, in effect, "merely a fact-finding, legislative advisory committee." *Defenders of Wildlife*, 199 Ariz. at 416, ¶ 6, 18 P.3d at 727 (citing 1994 Ariz. Sess. Laws, ch. 277, §§ 1–14 (2nd Reg. Sess.) (eff. April 25, 1994)). In addition, the legislature's 1994 amendments subjected ANSAC to more restrictive, specifically-enumerated evidentiary presumptions and requirements when collecting information regarding navigability, effectively ensuring that ANSAC would find most if not all Arizona rivers non-navigable. *See id.* The Arizona Legislature later enacted Senate Bill 1126, which declared that many of Arizona's watercourses—including the Lower Salt, Agua Fria, Hassayampa, and Verde rivers—were non-navigable and disclaimed all rights and title of the State to those waterways. *See* 1998 Ariz. Sess. Laws, ch. 43, § 2 (2nd Reg. Sess.).

¶ 8 Defenders of Wildlife, the State, and others challenged the constitutionality of the 1994 amendments, arguing that the new standards for determining navigability were so contrary to the federal test for navigability that the statutes were " 'deliberately designed to defeat trust claims' by setting up a framework of tightly-constructed presumptions that make the legislature's non-navigability findings virtually inevitable." *Defenders of Wildlife*, 199 Ariz. at 417, ¶ 10, 18 P.3d at 728. After the trial court granted summary judgment for the defendants, on appeal this court found that the legislature was required to apply the federal *Daniel Ball* standard for determining navigability and that many of the 1994 amendments were inconsistent with the *Daniel Ball* test because they defined the bed of a watercourse from the low-water mark, established "clear and convincing" as the burden of proof for determining navigability, and enacted evidentiary requirements and almost irrefutable presumptions in favor of non-navigability. *Id.* at 420, ¶¶ 18–21, 18 P.3d at 731. This court found that, although then-subsection (6) of A.R.S. § 37–1101 correctly paraphrased the *Daniel Ball* test, the additional requirements that the statutes imposed were invalid. *Id.* at ¶ 21.

¶ 9 In response to the *Defenders of Wildlife* decision, the legislature again revised the statutes relating to navigable watercourses, *see* 2001 Ariz. Sess. Laws, ch. 166, § 1 (1st Reg.Sess.), reinstating ANSAC as the adjudicative body responsible for determining navigability, *see* A.R.S. § 37–1122 (2003), and attempting to eliminate the additional requirements that this court had found to be invalid.[7] The revised ANSAC held public evidentiary hearings on the Lower Salt River on April 7 and 8, 2003. *See* A.R.S. §§ 37–1123(A), –1126 (2003). After briefing by the parties, ANSAC determined at a January 27, 2004 public hearing that the River was not navigable as of February 14, 1912. ANSAC issued its final report[8] in September 2005,

---

7. Included among the revisions made by the legislature in response to the *Defenders of Wildlife* decision was the deletion of subsection (F) of A.R.S. § 37–1128. *See* 2001 Ariz. Sess. Laws, ch. 166, § 9 (1st Reg.Sess.). Subsection (F), which had been added as part of the 1994 amendments, *see* 1994 Ariz. Sess. Laws, ch. 277, § 9 (2nd Reg.Sess.), had provided: "In finding whether a watercourse was navigable, the com-

mission shall consider the existence of dams and diversions of water and the impact of other human uses that existed or occurred at the time of statehood as part of the ordinary and natural condition of the watercourse."

8. A copy of the report may be viewed at www.azstreambeds.com.

summarizing its findings and determination as follows: [9]

> Based upon all of the historical and scientific data and information, documents and other evidence produced and considered by the Commission, the Commission finds that the Lower Salt River between Granite Reef Dam and its confluence with the Gila River is an erratic, unstable and undependable stream characterized by periodic floods, sometimes extreme, followed by periods of drought when there is little or no water in the riverbed. The Commission finds that in its ordinary and natural condition even in the absence of the existence of Roosevelt Dam and reservoir the Lower Salt River was a braided stream of 2 to 4 channels interspersed by sandbars and sand islands which shift with floods or high flow of water and as such had a configuration that would be impossible to be considered navigable or susceptible of navigability.

> Accordingly, the Commission [ ] finds that the Lower Salt River from Granite Reef Dam to its confluence with the Gila River was not used or susceptible of use for commercial trade or travel as of February 14, 1912 and therefore was not navigable as of that date nor was it susceptible to navigation.

¶ 10 Pursuant to A.R.S. §§ 12–905(A) (2003) and 37–1129(A) (Supp.2009), the ASLD and the State Land Commissioner, acting as an advocate for the public trust, *see* A.R.S. § 37–1102 (2003), filed a complaint in the superior court seeking judicial review of the administrative decision.[10] *See generally* A.R.S. §§ 12–901 to –914 (2003). The complaint alleged in part that, in reaching its determination, ANSAC misapplied the federal test of navigability as set forth in *Daniel Ball* because ANSAC had (1) not properly considered the River's "ordinary and natural condition" as the Commission failed to account for the "dramatic" effect

that pre-statehood "irrigation diversions, canals, and other human impacts" other than Roosevelt Dam and reservoir had on the flow of the River, (2) "fail[ed] to consider the unique circumstances concerning development of the Salt River Valley including the policy to use the Lower Salt's permanent flows for irrigation rather than preserving its flows for navigation," and (3) "misinterpret[ed] and misapplie[d] the 'highways for commerce' requirement by improperly defining 'commerce.'" The complaint further alleged that ANSAC had made its determination contrary to the controlling authority of the *Defenders of Wildlife* and *Hassell* cases, and had ignored or misstated the factual record regarding evidence of navigability, including hydrologic evidence demonstrating that the River's "flows were predictable and within a navigable range," geomorphic evidence demonstrating that the River "had a defined, persistent, low flow channel in which boating occurred," and "actual historic evidence of boating on the Lower Salt including the use of ferries."

¶ 11 Pursuant to the superior court's order, each side submitted a joint statement of facts on appeal, and on June 6, 2007, the parties presented oral argument to the court. In a minute entry filed August 6, 2007, the court affirmed ANSAC's determination that the River was not navigable as of February 14, 1912. The superior court issued a final signed judgment on August 7, 2007.

¶ 12 Appellants filed timely notices of appeal to this court, and we have jurisdiction over this appeal. *See* A.R.S. §§ 12–913, – 2101(B) (2003).

## STANDARD OF REVIEW

¶ 13 On appeal from the superior court's review of an administrative decision, we determine, as did the superior court, whether the agency's decision was illegal, arbitrary, capricious, or involved an abuse of discretion.

---

9. In conducting the "particularized assessment" required to determine whether the River was navigable, *see Hassell,* 172 Ariz. at 371, 837 P.2d at 173, ANSAC was required to make its determination "in writing with sufficient documentation and detail to confirm the rationale and basis for the determination." A.R.S. § 37–1128(C).

10. Defenders of Wildlife and others represented by the Arizona Center for Law in the Public Interest were initially designated as defendants, but they filed a motion to be realigned as plaintiffs, which the superior court granted.

*Koepnick v. Ariz. State Land Dep't,* 221 Ariz. 370, 374, ¶ 7, 212 P.3d 62, 66 (App.2009) (citing A.R.S. § 12–910(E)); *Callen v. Rogers,* 216 Ariz. 499, 502, ¶ 9, 168 P.3d 907, 910 (App.2007); *Eaton v. Ariz. Health Care Cost Containment Sys.,* 206 Ariz. 430, 432, ¶ 7, 79 P.3d 1044, 1046 (App.2003).

¶ 14 Assuming the proper tests have been applied, "[t]he question whether a watercourse is navigable is one of fact." *Hassell,* 172 Ariz. at 363 n. 10, 837 P.2d at 165 n. 10 (citing *O'Toole,* 154 Ariz. at 46 n. 2, 739 P.2d at 1363 n. 2; *Goose Creek Hunting Club, Inc. v. United States,* 207 Ct.Cl. 323, 518 F.2d 579, 583 (1975)). In reviewing factual determinations, we will not substitute our conclusion for that of the administrative agency; instead, we review the record to determine whether substantial evidence supports the agency's decision and whether the agency exercised its discretion reasonably and with due consideration. *See Callen,* 216 Ariz. at 502, ¶ 9, 168 P.3d at 910; *Siegel v. Ariz. State Liquor Bd.,* 167 Ariz. 400, 401, 807 P.2d 1136, 1137 (App.1991) (citing *Petras v. Ariz. State Liquor Bd.,* 129 Ariz. 449, 452, 631 P.2d 1107, 1110 (App.1981)).

¶ 15 If the administrative decision was based on an interpretation of law, however, we review that decision *de novo. Forest Guardians v. Wells,* 201 Ariz. 255, 259, ¶ 9, 34 P.3d 364, 368 (2001); *Eaton,* 206 Ariz. at 432, ¶ 7, 79 P.3d at 1046; *Defenders of Wildlife,* 199 Ariz. at 417, ¶ 9, 18 P.3d at 728; *see also United States v. Appalachian Elec. Power Co.,* 311 U.S. 377, 403–04, 61 S.Ct. 291, 85 L.Ed. 243 (1940) (stating that, in navigability cases, "[b]oth the standards and the ultimate conclusion invo[l]ve questions of law inseparable from the particular facts to which they are applied"), *superseded in part by statute as recognized in Rapanos,* 547 U.S. at 723–34, 126 S.Ct. 2208; *Huskie v. Ames Bros. Motor & Supply Co.,* 139 Ariz. 396, 401, 678 P.2d 977, 982 (App.1984) (stating that a court may draw its own legal conclusions from facts found or inferred in the judgment and is not bound by findings of fact on mixed questions of law and fact).

Thus, we determine *de novo* whether AN-SAC applied the proper legal tests to the facts presented. *See Appalachian Elec. Power,* 311 U.S. at 403–04, 61 S.Ct. 291.

## ANALYSIS

### I. Presumption Against Defeat of the State's Title

¶ 16 In *Defenders of Wildlife,* this court instructed that "determinations regarding the title to beds of navigable watercourses in equal footing cases must begin with a strong presumption against defeat of state's title." 199 Ariz. at 426, ¶ 54, 18 P.3d at 737 (citing *United States v. Alaska,* 521 U.S. 1, 34, 117 S.Ct. 1888, 138 L.Ed.2d 231 (1997); *United States v. Oregon,* 295 U.S. 1, 14, 55 S.Ct. 610, 79 L.Ed. 1267 (1935)). Relying on that instruction, Appellants assert that ANSAC's decision that the River was non-navigable must be declared invalid because, in making its decision, ANSAC ignored the strong presumption against defeat of the State's title and relied upon evidentiary presumptions and limitations previously rejected by this court as contrary to the federal test. In effect, Appellants maintain that ANSAC superficially reviewed the evidence through a non-navigability lens and, in doing so, ignored indisputable proof that the River was susceptible to navigation at statehood.

¶ 17 Neither *Defenders of Wildlife* nor the opinions on which that case was based, however, held that the burden of proof in a navigability determination must be placed on the party opposing navigability. Moreover, this court has previously recognized that the burden of proof rests on the party asserting navigability. *See Hassell,* 172 Ariz. at 363 n. 10, 837 P.2d at 165 n. 10 ("The burden of proof rests on the party asserting navigability unless the court takes judicial notice of the status of the watercourse." (citing *Land Dept. v. O'Toole,* 154 Ariz. 43 at 46 n. 2, 739 P.2d 1360 at 1363 n. 2 (App.1987); *Goose Creek Hunting Club,* 518 F.2d at 583)).[11] Further, Appellants have

---

11. *See also generally In re Westfall's Estate,* 74 Ariz. 181, 186, 245 P.2d 951, 955 (1952) ("A presumption, in the strict legal meaning of the word, is a rule of law that *in the absence of any evidence to the contrary* the trier of fact is compelled to reach." (emphasis added)); *In re*

not cited any persuasive authority suggesting that the provisions in § 37–1128(A) providing for navigability to be established by a preponderance of the evidence [12] are unconstitutional or contrary to federal law, and we have previously recognized that "a 'preponderance' of the evidence appears to be the standard used by the courts" as the burden of proof. *See Defenders of Wildlife*, 199 Ariz. at 420, ¶ 23, 18 P.3d at 731 (citing *North Dakota v. United States*, 972 F.2d 235, 237–38 (8th Cir.1992)). Consequently, the burden of proof lies with Appellants, as the proponents of navigability, who must prove navigability by a preponderance of the evidence.

▉ ¶ 18 What is clear and what we stress, however, is that ANSAC may not begin its determination with any presumption *against* navigability. Instead, ANSAC's approach and analysis must be wholly impartial and objective, while utilizing the proper legal test. *See generally* A.R.S. § 37–1121(B) (requiring that members of ANSAC be unbiased and not have interests affected by the Commission's determination); *see also Kent K. v. Bobby M.*, 210 Ariz. 279, 284, 110 P.3d 1013, 1018 (2005) (recognizing that the preponderance of the evidence standard "essentially allocates the risk of error equally between the parties involved").

*II. ANSAC's Evaluation of the River's Ordinary and Natural Condition*

▉ ¶ 19 As we have noted, our legislature has adopted a statutory test of navigability derived from *Daniel Ball:*

"Navigable" or "navigable watercourse" means a watercourse that was in existence on February 14, 1912, and at that time was used or was susceptible to being used, *in its ordinary and natural condition,* as a highway for commerce, over which trade and travel were or could have been conducted in the customary modes of trade and travel on water.

A.R.S. § 37–1101(5) (emphasis added). This test required ANSAC to determine the characteristics of the River "in its ordinary and natural condition" and whether, at the time of statehood, the River was used or would have been susceptible to use as a highway for commerce in that condition.

¶ 20 Appellants argue that ANSAC committed legal error by misapplying the *Daniel Ball* test. Specifically, they maintain that ANSAC failed to consider the Lower Salt River in its "ordinary and natural condition" because the Commission, in making its determination, evaluated the River in a condition that included dams, irrigation diversions, canals, and other human impacts, many of which had the effect of reducing the flow of the River. Appellants contend that ANSAC should have "backed in" those diversions that occurred before statehood and, had ANSAC done so, the Commission would have been compelled to find the River navigable. In effect, Appellants contend that, had the River's water not been removed before statehood, sufficient water existed for the River to be navigable. They further contend that ANSAC ignored or misinterpreted evidence concerning the River's ordinary and natural physical characteristics, including facts demonstrating that the River had a defined low flow channel with reliable adequate flow, and evidence of actual navigation. Our concern

*Hesse's Estate*, 62 Ariz. 273, 282, 157 P.2d 347, 351 (1945) (stating that "a presumption is not evidence of anything and ... should never be placed in the scale to be weighed as evidence" (citing *Seiler v. Whiting*, 52 Ariz. 542, 548–49, 84 P.2d 452, 454–55 (1938))); *Sheehan v. Pima County*, 135 Ariz. 235, 238, 660 P.2d 486, 489 (App.1982) (stating that "a presumption disappears entirely upon the introduction of any contradicting evidence and when such evidence is introduced the existence or non-existence of the presumed fact is to be determined exactly as if no presumption had ever been operative").

**12.** Section 37–1128(A) provides in pertinent part as follows:

After the commission completes the public hearing with respect to a watercourse, the commission shall again review all available evidence and render its determination as to whether the particular watercourse was navigable as of February 14, 1912. If the preponderance of the evidence establishes that the watercourse was navigable, the commission shall issue its determination confirming that the watercourse was navigable. If the preponderance of the evidence fails to establish that the watercourse was navigable, the commission shall issue its determination confirming that the watercourse was nonnavigable.

lies with the legal test applied by ANSAC to the evidence presented.

¶ 21 Some of the opponents of navigability argue that we need not address the legal argument because ANSAC added back in all man-made diversions before making its determination. They note that, in its final report issued in September 2005, ANSAC stated that it considered "all of the historical and scientific data and information, documents and other evidence produced" in evaluating the River's navigability. That statement does not, however, provide assurance that ANSAC applied the proper legal test to the evidence presented; instead, it merely asserts that ANSAC considered all of the evidence before the Commission.

¶ 22 Further, in its final report concluding that the River was not navigable, ANSAC stated that it reviewed the River "in its ordinary and natural condition even in the absence of the existence of Roosevelt Dam and reservoir," which was completed in 1910, shortly before Arizona's admission to the Union. Thus, ANSAC clearly made an effort to consider the effect of Roosevelt Dam on the character of the River. However, conspicuously absent from that statement and from ANSAC's analysis is any evaluation of the effect of the numerous other dams, canals, and man-made diversions identified in its report as existing as of February 14, 1912.[13] Although the Commission stated specifically that it considered only "the absence of Roosevelt Dam and reservoir" in determining the River's ordinary and natural condition, it made no mention of those other dams and diversions, and the only logical inference is that ANSAC did not evaluate their effect in determining the River's ordinary and natural condition. *See generally Defenders of Wildlife*, 199 Ariz. at 427, ¶ 62, 18 P.3d at 738. Supporting that inference is language within ANSAC's final report that indicates the Commission considered irrigation canals and similar diversions to be an "ordinary and natural condition" of the River. *See, e.g.*, Report, Findings and Determination Regarding the Navigability of the Salt River from

Granite Reef Dam to the Gila River Confluence ("Report"), at 40 ("[W]e can say that for a period of 700 years the normal or natural condition of the river was with diversion dams and canals irrigating fields.") *and* ("Thus one might argue that the use of the Salt River for irrigation could be expected and accepted and commonly encountered or usual and such use conforms to the normal and ordinary course of nature and thus is the normal and usual condition.").

¶ 23 Because the record appears clear that ANSAC did not evaluate the River's ordinary and natural condition in light of the numerous dams, canals, and other diversions other than Roosevelt Dam, we must determine whether failing to do so constitutes legal error on the part of the Commission. This is largely a question of first impression because, as the State avers in its opening brief, "No court has addressed whether a river is navigable for title purposes when, before statehood, diversions and dams altered its ordinary and natural condition." *See generally* Jennie L. Bricker, *Navigability and Public Use: Charting a Course Up the Sandy River*, 38 Willamette L.Rev. 93, 127 (2002) (recognizing that the question whether a navigability evaluation should "factor in" blasting or damming before statehood "has not presented itself in title navigability jurisprudence"). Our determination therefore requires us to consider the meaning of the term "ordinary and natural condition."

¶ 24 In examining the meaning of the term "ordinary and natural condition" as used in A.R.S. § 37–1101(5) and *Daniel Ball*, we look first to the language of the statute itself and will ascribe the plain meaning to that language unless the context suggests otherwise. *See Brunet v. Murphy*, 212 Ariz. 534, 539, ¶ 20, 135 P.3d 714, 719 (App.2006); *Byers–Watts v. Parker*, 199 Ariz. 466, 469, ¶ 10, 18 P.3d 1265, 1268 (App.2001). We look to the plain language of the statute because it is the best evidence of the legislature's intent. *Zamora v. Reinstein*, 185 Ariz. 272,

---

**13.** In his answering brief and at oral argument, counsel for the Salt River Project Agricultural Improvement and Power District ("SRP") has suggested that Roosevelt Dam was actually a consolidation of all the prior diversions, but the record does not appear to support counsel's suggestion.

275, 915 P.2d 1227, 1230 (1996); *In re Estate of Jung,* 210 Ariz. 202, 204, ¶ 12, 109 P.3d 97, 99 (App.2005); *In re Adam P.,* 201 Ariz. 289, 291, ¶ 12, 34 P.3d 398, 400 (App.2001). To glean the plain meaning of the words, we may consult a dictionary for definitions. *See, e.g., State v. Wise,* 137 Ariz. 468, 470 n. 3, 671 P.2d 909, 911 n. 3 (1983). Only if the plain meaning of the language is not clear do we consider other factors, such as the context of the statute, its historical background, its effects and consequences, and the spirit and purpose of the law. *State v. Garza Rodriguez,* 164 Ariz. 107, 112, 791 P.2d 633, 638 (1990); *Estate of Jung,* 210 Ariz. at 204, ¶ 12, 109 P.3d at 99. Also, when possible, we interpret statutory language in a way that gives meaning to each word and clause, and avoids making any part of a statute superfluous, contradictory, void, or insignificant. *See Devenir Assocs. v. City of Phoenix,* 169 Ariz. 500, 503, 821 P.2d 161, 164 (1991); *Garza Rodriguez,* 164 Ariz. at 112, 791 P.2d at 638; *State v. Johnson,* 171 Ariz. 39, 42, 827 P.2d 1134, 1137 (App.1992).

¶ 25 Giving meaning, as we must, to all words within the phrase "ordinary and natural condition," we conclude that the River must be evaluated in both its "ordinary" *and* "natural" condition. Both of these words have specific meaning and would not have been included in the definition of navigability unless their meaning was to be considered and applied in evaluating the navigability of the River.

¶ 26 The word "ordinary" means "[o]ccurring in the regular course of events; normal; usual." Black's Law Dictionary 1209 (9th ed.2009); *accord* http://dictionary.reference.com (defining "ordinary" in part as "customary; usual; normal"); *see also United States v. Holt State Bank,* 270 U.S. 49, 57, 46 S.Ct. 197, 70 L.Ed. 465 (1926) (describing drought conditions on the Mud River as "exceptional" and not "the usual conditions"); *Oklahoma v. Texas,* 258 U.S. 574, 587, 42 S.Ct. 406, 66 L.Ed. 771 (1922) (recognizing "an occasional tendency to emphasize the exceptional conditions in times of temporary high water and to disregard the ordinary conditions prevailing throughout the greater part of the year").

¶ 27 The word "natural" may be defined as meaning: "In accord with the regular course of things in the universe and without accidental or purposeful interference ... [n]ormal; proceeding from the regular character of a person or thing ... [b]rought about by nature as opposed to artificial means ... [and] [u]ntouched by civilization; wild." Black's Law Dictionary at 1126 (providing the example that "only a small part of the forest remains in its natural state"); *accord* http://dictionary.reference.com (defining "natural" in part as "in a state of nature; uncultivated, as land"). Thus, a river in its natural condition would be one untouched by civilization, i.e., man-made diversions. *Cf. Strom v. Sheldon,* 12 Wash.App. 66, 527 P.2d 1382, 1383 (1974) ("Among the rights of riparian ownership is the right to have the water flow in its natural course, and that course may not be diverted by upper and lower riparian owners." (citing *Sund v. Keating,* 43 Wash.2d 36, 259 P.2d 1113, 1116 (1953)). Because dams and canals that cause low flow or a dry bed are man-made diversions, they are not part of the natural condition of the River.[14]

¶ 28 Applying these definitions, we conclude that ANSAC was required to determine what the River would have looked like on February 14, 1912, in its ordinary (i.e., usual, absent major flooding or drought) and natural (i.e., without man-made dams, canals, or other diversions) condition. *Cf. Holt State Bank,* 270 U.S. at 56–57, 46 S.Ct. 197 (determining Mud Lake's navigability by considering the lake in its "natural and ordinary condition," before it had been drained by a ditch); *Nw. Steelheaders Ass'n v. Simantel,* 199 Or.App. 471, 112 P.3d 383, 391–95 (2005) (holding that segments of the John Day River were navigable at the time of statehood after considering the fact that the river's flow had been substantially reduced since statehood by irrigation withdrawals and channel degradation attributable to upstream mining operations).[15] Although ANSAC stated that

---

**14.** In its final report, ANSAC did recognize that dredging the River to create a more substantial channel "would not be in the ordinary and natural course of events." *See* Report, at 37.

**15.** *See also generally Econ. Light & Power Co. v.*

it did consider the River in its "ordinary and natural condition," the record supports the conclusion that ANSAC effectively conflated these terms, focusing on the ordinary condition of the River, while discounting analysis of the River's natural condition. By treating the word "natural" as interchangeable with the word "ordinary," ANSAC made the word "natural" superfluous, thereby contravening a basic tenet of statutory construction. ANSAC should have considered *both* the River's ordinary condition *and* its natural condition in determining its navigability. Consequently, although ANSAC considered a great deal of evidence concerning the condition of the River, and reviewed evidence from various times before statehood, ANSAC ultimately failed to apply the proper legal standard to the evidence presented.

 ¶ 29 Each side contends that, if the proper test of navigability is applied, the evidence compels a finding supporting its position regarding the River's navigability. We have examined the evidence considered by ANSAC and submitted to the superior court, but we will not re-weigh that evidence and substitute our judgment. *See Callen*, 216 Ariz. at 502, ¶ 9, 168 P.3d at 910; *Culpepper v. State*, 187 Ariz. 431, 436, 930 P.2d 508, 513 (App.1996). That is because, although we agree that "substantial evidence" exists "from which a factfinder might conclude that [the River] met the applicable standard of navigability at the time that Arizona became a state," *Hassell*, 172 Ariz. at 363, 837 P.2d at 165, we are also mindful that "[i]t is not our purpose to adjudicate on appeal the navigability at statehood of any particular Arizona river or stream." *Id.* Assuming the proper tests have been applied,

the question whether the River is navigable is one of fact, *id.* at n. 10, to be determined by the Commission. *See* A.R.S. §§ 37-1123(A), -1128. Moreover, as we have recognized, ANSAC itself has made contradictory findings as to the ultimate question of fact, *compare supra* ¶ 6 *with supra* ¶ 9, albeit most recently while applying the incorrect standard for determination. Because the proper legal test was not applied, we must vacate the superior court's judgment and remand for ANSAC to consider whether the River would have been navigable had it been in its ordinary and natural condition on February 14, 1912.[16]

 ¶ 30 The next question that we must then address is: When was the River in its natural condition? The obvious answer is that it was in its natural condition before the Hohokam people arrived many centuries ago and developed canals and other diversions that actively diverted the River. However, little if any historical data exists from that period. Further, the uncontroverted evidence suggests that these diversions disappeared through non-use over the centuries, and by the 1800s, the River had largely reverted to its natural state. Consequently, the River could be considered to be in its natural condition after many of the Hohokam's diversions had ceased to affect the River, but before the commencement of modern-era settlement and farming in the Salt River Valley, when some of the Hohokam's diversions were returned to use and other man-made diversions and obstructions began to affect the River. Evidence from that early period should be considered by ANSAC as the best evidence of the River's natural condition.[17]

United States, 256 U.S. 113, 121–24, 41 S.Ct. 409, 65 L.Ed. 847 (1921) (concluding that, although a river might be currently non-navigable due to artificial obstructions, it could nonetheless be found navigable under the federal test if it had been navigable in its natural state); *The Montello*, 430, 87 U.S. 430, 440–43, 22 L.Ed. 391 (1874) (clarifying the requirement that a river be considered in its natural state); *Defenders of Wildlife*, 199 Ariz. at 424, ¶ 46, 18 P.3d at 735 ("The fact, however, that artificial obstructions exist capable of being abated by due exercise of the public authority, does not prevent the stream from being regarded as navigable in law, if, supposing them to be abated, it be navigable in fact in its

natural state." (quoting *Econ. Light & Power Co.*, 256 U.S. at 118, 41 S.Ct. 409)).

16. Because we vacate on this basis, we do not consider the litigants' arguments regarding repose-of-title issues, whether a finding of navigability would grant the State interest in the River's bedlands within the boundaries of the Gila River Indian Reservation, and whether ANSAC misconstrued the "highway for commerce" test.

17. Quoting *Alaska v. United States*, 662 F.Supp. 455, 463 (D.Alaska 1987), the opponents of navigability argue that the requirement that naviga-

### III. ANSAC's Consideration of Evidence

¶ 31 Appellants also contend that ANSAC erred in reviewing and considering expert opinions and other evidence that evaluated the River in its depleted condition— after dams, canals, and other man-made diversions—rather than when it was free of artificial obstructions. Although evidence of the River's condition after obstructions caused a reduction in its flow is likely of less significance than evidence of the River in its more natural condition, and may in fact have "minimal probative value," Appellants' contention generally goes more to the weight to be afforded the evidence than its admissibility. *See generally United States v. Utah,* 283 U.S. 64, 82, 51 S.Ct. 438, 75 L.Ed. 844 (1931) ("The evidence of the actual use of streams, and especially of extensive and continued use for commercial purposes may be most persuasive, but, where conditions of exploration and settlement explain the infrequency or limited nature of such use, the susceptibility to use as a highway of commerce may still be satisfactorily proved.").[18] We will not fault ANSAC for considering all relevant evidence presented to it because that is the task with which ANSAC is charged. *See* A.R.S. § 37–1128(A) (requiring that the Commission review *all* available evidence); *Defenders of Wildlife,* 199 Ariz. at 425, ¶ 52, 18 P.3d at 736 (reasoning that "all evidence should be examined during navigability determinations and no relevant facts should be excluded"). Even if evidence of the River's condition after man-made diversions is not dispositive, it may nonetheless be informative and relevant. *See generally Oregon,* 295 U.S. at 15–18, 55 S.Ct. 610 (considering a master's report making findings of watercourses' present and past physical conditions). Assuming the evidence has indicia of reliability, the determination of the relevance and weight to be afforded the evidence is generally for ANSAC to make.

### IV. Preclusion of Appellants' Assertion of Navigability

¶ 32 SRP also contends that Appellants are precluded by the doctrines of *res judicata* and collateral estoppel from asserting the River's navigability based on proceedings in *Salt River Pima–Maricopa Indian Community v. Arizona Sand & Rock Co.* ("SRPMIC"), No. CIV 72–376–PHX, (D.Ariz. April 13, 1977), a consolidated federal district court case on which ANSAC relied in making its determination.

¶ 33 The doctrines of *res judicata* and collateral estoppel have similar purposes but are nevertheless different. *Hawkins v. State, Dep't of Econ. Sec.,* 183 Ariz. 100, 103, 900 P.2d 1236, 1239 (App.1995).

Under the doctrine of *res judicata,* a judgment on the merits in a prior suit involving the same parties or their privies bars a second suit based on the same cause of action. This doctrine binds the same

---

18. bility be determined at statehood means that "the *Daniel Ball* test is to be applied to the physical dimensions and configuration of the river existing at the time of statehood." We note, however, that this statement of the court has its genesis in the State of Alaska's argument "that the requirement of the equal footing doctrine that a waterway must have been navigable at the time of statehood for title to have passed to the state means only that changes which have occurred in the physical configuration of the waterway since the time of statehood are to be disregarded for the purpose of determining title navigability." *Id.* at 459. We have no quarrel with that statement or the proposition that "[t]he key moment for the determination of title is the instant when statehood is created." *Alaska v. United States,* 213 F.3d 1092, 1097 (9th Cir.2000). Accordingly, ANSAC must consider whether the River would have been navigable *in its ordinary and natural condition* on February 14, 1912.

*See also State v. Murray,* 184 Ariz. 9, 30, 906 P.2d 542, 563 (1995) (concluding in a criminal case that an expert's failure to follow prescribed FBI methodology for preserving and analyzing footprint evidence went to the weight rather than the admissibility of the evidence); *Hawkins v. Allstate Ins. Co.,* 152 Ariz. 490, 499, 733 P.2d 1073, 1082 (1987) ("[R]elevance requires only a modicum of rationally probative force."); *cf. Bledsoe v. Salt River Valley Water Users' Ass'n,* 179 Ariz. 469, 471, 880 P.2d 689, 691 (App.1994) (citing *Wagner v. Coronet Hotel,* 10 Ariz.App. 296, 299, 458 P.2d 390, 393 (1969) ("Prior to the reception of evidence based on out-of-court experiments, it must ordinarily be shown that the experiments were conducted under substantially similar conditions to those prevailing during the occurrence in controversy. The conditions need not be identical and minor variations in conditions go to the weight rather than the admissibility[.]" (citations omitted))).

party standing in the same capacity in subsequent litigation on the same cause of action, not only upon facts actually litigated but also upon those points which might have been litigated....

The doctrine of "collateral estoppel" is a doctrine of issue preclusion. It bars a party from relitigating an issue identical to one he has previously litigated to a determination on the merits in another action. The elements necessary to invoke collateral estoppel are: the issue is actually litigated in the previous proceeding, there is a full and fair opportunity to litigate the issue, resolution of such issue is essential to the decision, there is a valid and final decision on the merit s, and there is a common identity of the parties.

*Id.* (quoting *Gilbert v. Bd. of Med. Exam'rs*, 155 Ariz. 169, 174, 745 P.2d 617, 622 (App. 1987) (citations omitted), *superseded on other grounds by statute as stated in Goodman v. Samaritan Health Sys.*, 195 Ariz. 502, 508 n. 7, ¶ 25, 990 P.2d 1061, 1067 n. 7 (App.1999)). "Whether by way of res judicata or collateral estoppel, the preclusive effect of a judgment is limited to parties and persons in privity with parties." *Daystar Invs., L.L.C. v. Maricopa County Treasurer*, 207 Ariz. 569, 573, ¶ 15, 88 P.3d 1181, 1185 (App.2004) (citing *Fremont Indem. Co. v. Indus. Comm'n*, 144 Ariz. 339, 342, 697 P.2d 1089, 1092 (1985) ("[I]t is axiomatic that a stranger to a litigation may not be bound by a determination made therein for purposes of subsequent litigation.")).

¶ 34 In 1972, the Salt River Pima–Maricopa Indian Community filed an action in federal court to eject certain defendants from lands claimed to be part of the Salt River Indian Reservation ("the Reservation").[19] A portion of the lands in dispute was situated within the banks of the River below Granite Reef Dam. A series of cases involving the south boundary of the Reservation followed and were consolidated. SRP, the State, and Maricopa County were among the parties involved in the consolidated action. In its consolidated pretrial order, the district court

noted, "The following fact [ ][is] admitted by the parties and require[s] no proof: ... The Salt River is not now and never has been a navigable river." Later, in its final judgment, the court adopted the parties' stipulations by finding "all of the facts agreed to by the parties in the Pre–Trial Order."

¶ 35 SRP contends that, because the parties in *SRPMIC* stipulated that the River was not navigable, and that stipulation was incorporated in the district court's final judgment, the State is (and therefore Appellants are) precluded from litigating the issue of navigability in this case. We disagree.

¶ 36 This court previously rejected a similar argument with respect to the River in *Calmat of Arizona v. State ex rel. Miller*, 172 Ariz. 300, 836 P.2d 1010 (App.1992), *affirmed in part and vacated in part on other grounds*, 176 Ariz. 190, 859 P.2d 1323 (1993). In *Calmat*, the plaintiff in an inverse condemnation action argued that the State should be estopped from asserting an ownership interest in the River's bedlands because the State's motion for summary judgment in *Hassell* had argued that the State did *not* own the Salt River bed. *Id.* at 310–11, 836 P.2d at 1020–21. Reasoning that such a conclusion would be inconsistent with our analysis and holding in *Hassell*, we held that the State was not only free to assert the navigability and its ownership of the River's bedlands, but had a duty to do so under the public trust doctrine. *Id.* at 311, 836 P.2d at 1021.

¶ 37 We also note that *SRPMIC* involved causes of action in trespass and ejectment, not navigability for public trust purposes. Further, the State in that case consisted of the Director of the Arizona Department of Transportation ("ADOT") (formerly the Arizona State Highway Commission), whose interest in the subject property was limited to certain licenses and permits for removal of sand and gravel, and rights-of-way granted to ADOT by the Bureau of Reclamation, not the State Land Commissioner, who is responsible for advocating for the public trust. *See* A.R.S. § 37–1102. Thus, neither the ASLD

---

**19.** The case resulted in a published decision, but the issues resolved in that decision are unrelated to the issue raised in this case by SRP. *See*

*SRPMIC v. Arizona Sand & Rock Co.*, 353 F.Supp. 1098 (D.Ariz.1972).

nor any other Appellants in this case were parties to the *SRPMIC* lawsuit. Further, in *SRPMIC*, the district court was not required to and did not conduct the particularized assessment of the River's navigability required by *Hassell*. *See* 172 Ariz. at 371, 837 P.2d at 173; *see also Calmat*, 172 Ariz. at 311, 836 P.2d at 1021. Instead, the court simply adopted the parties' stipulations. Because the Director of ADOT could not simply give away potentially public trust land, *see Hassell*, 172 Ariz. at 371, 837 P.2d at 173, *SRPMIC* is irrelevant to these proceedings and the doctrines of *res judicata* and collateral estoppel do not apply.

### V. *Attorneys' Fees and Costs*

¶ 38 Finally, Appellants Defenders of Wildlife, Donald Steuter, Jerry Van Gasse, and Jim Vaaler request an award of attorneys' fees and costs associated with this appeal pursuant to A.R.S. § 12–348 (2003) and the private attorney general doctrine. *See Defenders of Wildlife*, 199 Ariz. at 428, ¶¶ 65–66, 18 P.3d at 739. Because they are the prevailing party on appeal, we grant their request, contingent on their compliance with Rule 21(a) and (c) of the Arizona Rules of Civil Appellate Procedure.

### CONCLUSION

¶ 39 For the aforementioned reasons, we vacate the superior court's judgment upholding ANSAC's administrative determination that the Lower Salt River was non-navigable as of February 14, 1912. We remand for further proceedings consistent with this decision.

CONCURRING: PATRICK IRVINE and PHILIP HALL, Judges.